Okay, we're having your argument in our last case, Solomon v. Bert Bell, Pete Rozelle, Player Retirement Plan, whenever the lawyers are ready. Good morning. May it please the Court? Good morning. My name is Michael Junk. I'm here on behalf of the Bert Bell, Pete Rozelle NFL Player Retirement Plan. I'm going to call that the plan for short. Jesse Solomon is a former football player, and the plan happens to offer total and permanent disability benefits to former players. Mr. Solomon sought a particular category of total and permanent disability benefits. I'm going to call those T&P benefits. It's a mouthful. He sought football degenerative T&P benefits, and to receive those, he had to demonstrate that he was totally and permanently disabled by a certain date, and that was March 31st of 2010. The retirement board is the plan's fiduciary, and it determined after reviewing the record and looking at the sequence of events leading up to his application, that Mr. Solomon had not sustained his burden, and that's why we're here today. Mr. Solomon… As an orthopedic or as to cognitive? There were two separate applications. The first one in 2009 was… No, no. I'm saying the board's determination. Where's there's evidence in the record that the board's final determination dealt with cognitive issues? The board looked at… No, I said in the record, where's the evidence? I have the denial letter, I think it is, at JA 822 and 23. Is that it? Letter dated November 23rd, 2011. Is that the final denial? That would be it. Where in that letter does it indicate anything about his cognitive claim? I don't think the letter specifically calls out the evidence or the arguments concerning his cognitive claims. The letter, what it is doing, is addressing the arguments that Mr. Solomon presented, appealing that decision ultimately to the retirement board. What he did with his appeal leading up to that final determination was to sustain or to demonstrate that he was totally and permanently disabled by the operative date. Mr. Solomon pointed the board to specific evidence. That was his prior application, which was based on orthopedic impairments. No, it says… Go ahead. Not entirely. He certainly acknowledges that his first application related primarily to orthopedic injuries, but he did submit evidence, even in his first application of cognitive impairments, in the form of MRI records showing results of high velocity impact hits from 2006. Right. Correct? But the first application, there's an application form, which is in the record, and on that application form, Mr. Solomon represented that his application was based on orthopedic injuries only. That's what, I did say that. I'm just pointing out that it also included the MRI tests reflecting the cognitive impairments. It did include those. I believe that's correct. That is correct. My understanding is that the plan took his first application to be for orthopedic disability. It was, and they did. Sure. Okay. So, I'm reading the paragraph now. This is under discussion. One, two, third paragraph. The retirement board determined that you were not totally and permanently disabled before March 31, 2010. First, the retirement board noted that you previously applied for total and permanent disability benefits in 2009, and that your claim was denied, as was your appeal. The retirement board determined that the disposition of that earlier claim is incompatible with the finding that you were totally and permanently disabled prior to March 31, 2010. That says you applied for orthopedic disability, you didn't get it, and we now say it's inconsistent. For us to now say you're disabled is inconsistent with that, but it wouldn't be incompatible if this was a cognitive claim. Well, this goes back to... I'm just reading from the letter now. I'm reading from the letter. Right. And I think, and I didn't write the letter. I wasn't even around. You know what? It's your letter. It's your client's letter. It doesn't make any difference whether you wrote it or whether you were alive when it was written. It's your letter. But can you explain how I think that letter came about? Go back to my point that I started with. That doesn't matter. You weren't around then. I'm reading the words, and the words clearly, the only impression I think you could take is that you failed on your earlier attempt, and we think because you failed that, you lose. But you said it. His first claim was orthopedic. I don't want to try to beat you up on this, but I mean, he made a claim for cognitive. He did. And so this appeal doesn't even address that. This denial doesn't even address it that I can see. Let me just say, so I'm clear, that the decision letter addressed the points that Mr. Solomon made as he brought that appeal to the board to establish how he was and why he was T&P, totally and permanently disabled, prior to March 31st, 2010. But this letter, this letter, this has to be in response to some kind of second iteration because they explained saying, we've already ruled on this. You had an appeal, and based on that, it's inconsistent or incompatible to say you're now disabled. Isn't this clearly in response to a cognitive claim? Well, taking the letters is a seer. It is either is or isn't. I just thought that was a given. Am I wrong? I thought this, in the state of November the 23rd, 2011, I thought this is in response to Mr. Solomon's cognitive disability claim. Is it? It's responding to that by implication, and the implication is that what was said in letters leading up to that letter was that he had not sustained his burden to prove that he was totally and permanently disabled, even by cognitive impairments or brain injuries. No. Because No, what it says is that the retirement board determined that the disposition of that earlier claim is incompatible with finding that you were totally and permanently disabled prior to March 31st, 2010. But that earlier claim was orthopedic. I mean, I don't think there's any dispute about that, is there? There is no dispute that that's what the letter says. And the earlier claim, which it references and says, this is a paraphrase, you've already raised a disability claim, you didn't win it, you appealed it, you lost the appeal, and now that stops it. You're not disabled. But it doesn't address the fact that this claim is entirely different than the basis for the first claim. Right, that is true. There were a sequence of determination letters issued by the board, and I'm looking in the record at JA808. And this is the first JA808. And this is the first determination by the retirement board where it awarded Mr. Sullivan the lower category of inactive T&P benefits. And on page 808, the retirement board is explaining there in the top paragraph. After the review of the records you submitted, the board found that the record did not support a finding of T&P, total and permanent disability, prior to March 31, 2010. So the board had looked at the evidence, including the evidence on his cognitive disability, which the point there is that there's not a single... So what is the... No, no, no. So what is the letter 822? What is that? He received, Your Honor, a further appeal from this determination. So this is the final word? 808? No. No, 822. It is the final word. 822 is the final word. Yes. The final word. It is. And in that final word, there is no mention of, other people asked questions too, of a cognitive disability claim. And this is a separate claim which this letter says is foreclosed, not paraphrasing, is foreclosed by your earlier law, which you admit was orthopedic. That's correct. Does that... It seems to me, it looks to me like you haven't even addressed his cognitive claim. Well, the prior letter looking... No, but this is... We have the final letter. I think what I'm trying to say is I think the letters need to be read in sequence. Okay. Suppose, just suppose, that we think that this is the final letter and this is the rationale that's given. Can you win? Yes, I think we can win. How? And how would that be? Because the evidence on the brain injury or the cognitive impairment, if you look at what the board determined was that it could not upend and undo its prior final determination in November 2009. It wouldn't... That's the point, but that's... It would just not... But... You know, you really are wasting a lot of time. I'm sorry. The second appeal doesn't build on the first appeal. It doesn't upend it. This is an appeal of a different impairment. And I don't even understand why we're arguing about this. The problem that the district court... One of the problems that the district court had is the failure... There is no... You don't think that's the very definition of arbitrary? You lost because you lost. We looked at everything. You still lose. Right. What more do we... What do we credit from the actions that the plan has taken? Where's the reasoned analysis that lies behind any of this? The reasoned analysis, to me, is understanding the sequence that led to... No, the record. Point me in the record to any indication whatsoever that the plan attempted any reasoned assessment of the evidence that was presented with respect to cognitive impairments. Did it mention in detail all of that evidence? Did it mention anything? It did not. Did it mention any evidence? Not in the letters. No. Then how can that be anything but an abuser discretion? Well, because that... But that's the only thing that's at issue now, the cognitive impairments, right? That seems to be the case, yeah. What seems to be the case? But the cognitive evidence, I think, was described in the board's earlier interim determination, where it said we looked at the record and it does not sustain your burden of proof. Did the board detail all of the evidence that it reviewed? Any. No. Did it mention the cognitive... Did it even mention evidence? It did not mention that cognitive evidence. I think because it did not directly address the points that Mr. Solomon presented to the board in that appeal. So that's clearly arbitrary. I mean, by definition, just acknowledge that that's arbitrary. The sequence of... They didn't look at the evidence supporting impairment. Well, if you look at it, it doesn't support impairment. We're not... No. The board had to look at it. And I think that it did look at it. But you just said they didn't. No, I said it wasn't mentioned in the letter. I can't... I mean, obviously, it was not specifically called out in the letter. But to establish his total and permanent disability by the March 31st deadline, Mr. Solomon pointed to two facts, ultimately. It was his prior application and it was his SSA determination. No. He has a bunch of experts whose testimony is undisputed. June 11, 2010. Markedly, that is two months afterwards. But they said that this was a disease that degenerated over a five- to ten-year period. I just want to look in the record at JA 810, 810. This is an earlier letter you keep sending us to. No, this is Mr. Solomon's appeal letter. I'm sorry. You have undisputed evidence of the two neurologists. Right. Two neurologists, one of whom was the plan's neurologist. Right. Supporting his second appeal. And the only argument you can have is that they took place two months after, not even two months, six weeks after the March 31 deadline. But they said that this degenerated over a five- to ten-year period. Right. So that took place before the March 31, 2010. Having a condition manifest prior to the March 31st deadline does not entitle a player to total improvement. Do you have anything, any explanation of what the plan did? The plan, Mr. Solomon had applied first in November or March 2009. He received a final determination. On orthopedic injuries, which we established. Correct. The board was not going to upend that decision. How would it be upending a decision on a different basis? It was now bringing claims based on cognitive impairment. The board was not going to find that he was totally and permanently disabled. Based on an entirely different characteristic of impairment. Because with his first, yes, with his first application, the presumption. And that's reason. I think so. Ignore, so ignoring. So he was just out of luck. Not at all. After the first application. No. But that is, that's all you're giving us. What? That's all you're giving us. I understand. Let me, he could have applied for that first application on cognitive impairment and sprain injuries. Anything under the sun. What difference does it make? You can make two applications. He can apply again. Correct. He could have applied again. He did. He did. Yes. And he could have applied again the next day on a new impairment. We don't know why he lost. What's wrong with the second application? You can't point us to anything. Why did the board turn down his second application? That's all we're asking. They seem to think that their denial of the first application was race judicata or something. Right. With respect to finding him totally and permanently disabled prior to that date. Let me make this clear. We don't think that makes much sense. It looks like they didn't even address his cognitive disability. And it looks like based on at least somebody's plan pick, he had a cognitive disability or cognitive problem way before the deadline. Why didn't the board explain all that in their decision? And I think, pointing back to Mr. Solomon's appeal, all I can say is that I think that the board was responding to the arguments. Okay. Where is that? Where did that happen? You referred us to something where it wasn't. I think it was JA 810. I closed it up. He's writing himself. He's writing the appeal letter. Without any lawyer. That's my understanding. And you'll see there that he's writing to appeal, and he's saying that he's entitled to football degenerative benefits. Right. And he's pointing back to his prior application that he filed previously. Right. And he also mentions his Social Security award in there. And I believe that the retirement board was responding to that. And that's evidence. His letter is the evidence on which the plan made its decision. I'm saying it explains why the final letter from the retirement board was focused on those points. Yes. That letter. I just want to ask another question about something. Why is the plan fighting him so incredibly hard? Over $1,400 a month. And when he makes the claim through your own doctor that he's got a problem. I don't know enough about this. Is this part of collective bargaining? Is it? Yes. The plan is the product of collective bargaining. And why in the world would you – I guess maybe current players don't want money to come out for past players or something. I don't think that's a motivating factor whatsoever. Why in the world would any player playing professional football – and I would have been except I decided to go to the courts instead. But I don't understand why any player would look at this and go, this is one heck of a great deal for players. We play as hard as we can, give everything we got, get banged up. I saw something in the record I think, 69,000 tackles. That's incredible. We do all we can. And then we apply when the doctors say I have a problem based on those hits. And they say, you aren't orthopedically disabled. Go away for $1,400. $1,400. I mean, is that – to me, by the way, I'm not counsel. You are, I would say. Somebody ought to scratch their head and say, does this really look good? We don't have much of a legal argument, but we're willing to fight to the death to deny somebody a relatively small amount of benefits. Does that make sense to you? Regardless of the amount of benefits to the question of why and how this all happened, I think it's a sequence of events, understanding the history. Do you think that looks good to players, what's going on in this courtroom today? It's not necessarily part of the determination.  It's just a real-world question I'm asking. I can't comment on what looks good or doesn't look good. Do you think Mr. Solomon could? I bet he could comment on it. I think he might have something to say. I don't think so. And what led us here, I think, is the board, the fiduciaries, trying to follow the terms of the plan as written. But they didn't. I respectfully disagree. We have to accept. You're telling us that we have to take their word on the basis of nothing. That's not it at all. I'm well out of time if I might respond. But we've gone around. Sure, you can respond. If you can answer that question. The point I would bring to bear on the cognitive issue is that there's not a statement in the record anywhere that he had total and permanent disability due to a cognitive impairment, and that's the issue, the timing issue. Prior to the March 31, 2010 deadline. He is suffering from severe cognitive impairment. And what was the date of that statement? June 11th. And said that he's generated over a five, ten-year period. That's before the June 11th. Right. And during that five to ten-year period, there were periods where he was working. He was working through, I think, 2007, 2009. So my point is when an impairment begins to develop, how it manifests, whether that leads to at a point in time. I know that. But the board could say we see that. We see what the information is. It's not clear enough. We recognize this is a separate appeal on a separate basis. Separate basis, they didn't know that. Okay. Thank you very much.  Mr. Abelson. Hello, Your Honors. Adam Abelson with Cy Smith on behalf of Jesse Solomon. I think Your Honors have hit the nail on the head here. The board was bound, if it was going to deny Mr. Solomon's benefits, to have substantial evidence in support of that denial. Not only did it have no substantial evidence, it had zero evidence. The question before the board was whether Mr. Solomon was substantially impaired from working by his cognitive disabilities resulting from football. Okay. Can you turn to the letter, his letter, J-1-8-10? Yes. I take it he was not represented at the time. Correct. Okay. Your colleague on the other side makes the representation that the only thing that he said to the board was that he was continuing to appeal about the thing that he had already lost on. So the November letter was, as you put it, the final decision. I understand what the board did, but what I'm asking you to look at is his letter to them that triggered whatever it is they did because that's apparently what the board relies on here. Right. So this letter, just to put it in context, so Mr. Solomon made his second application for cognitive-based DPD. And is that somewhere in this record? The application, yes. The second application is at J-667. Okay. And that was done before this letter? Yes. So the sequence was that there was the Mr. Solomon's second application. The board denied that, which was the first letter that Mr. Jung cited. That award, the board at that point awarded Mr. Solomon the lower level, but what Mr. Solomon's application was for was for football degenerative benefits. Right. So he appealed the aspect of the first denial on the second application for their denial of his request for the higher level of benefits. And so he was saying, again, without a lawyer on his own, I believe I am entitled to the higher level of benefits. Now, the board was not entitled to then only look at the letter that he submitted in connection with appealing that decision. There was a full record, and the board's obligation as an ERISA fiduciary is to look at the record before it and make a reasoned decision based on that record, and it can only reach a decision if it has substantial evidence to support it. Now, the question, again, before the board was, was Mr. Solomon substantially impaired from working as of March 2010? Not only was there no substantial evidence to support that, but there was what Judge Garbus explained was overwhelming evidence to the contrary. Now, first of all, it was the evaluations by Dr. Fernandez, who was a psychiatrist, and Dr. DiDio, the plan's neurologist, that Mr. Solomon was. So what do we do? What do we do under these facts with the board? If we were to think the board didn't respond, did you say the evidence is what we pointed to? There's degenerate, I mean, a cognitive problem that took five to ten years to happen. We take all that, say it was an arbitrary decision, and it's clear common sense tells you that he was disabled. What do we do? And award him benefits. What do we do? Correct. Award the benefits. That's the courts' point. How do we get there? Usually we remand to a board, as you know, and think about the immigration context. We always have to remand. We can never give anybody any relief. We go out the door. So why is this different? Right. So a couple of points. First, assuming the starting point is that there was an abuse of discretion in this case for all the reasons we've stated, first of all, the plan has never argued that there should be a remand. And in the Helton case, this court said that when an arrested fiduciary has waived, which the plan has done in this case, a request for a remand, that's it. It doesn't get another shot. It had multiple shots here, not only Mr. Solomon's first remand. Don't overstate it. You say they didn't ask for a remand, so they can't get one. That's correct. They waived that decision. Okay. What then happens? What happens next? This court would remand with instructions to the district court to order the benefits. And that is what this court has done on a routine basis in these kinds of cases. That was the outcome in the Janney case, which was the Mike Webster and the Marshall case. Did the court award benefits here or not? Did the court award benefits here? Yes. So we would just affirm? We would just affirm. And we would do so without reaching the question of the effect of the Social Security Administration's determination. Your co-counsel is trying to answer for you, but I'll focus. I'll ignore his head-nodding, vigorous head-nodding and let you respond. Well, that is correct. These are two alternate bases for affirming. You don't have to address that. You don't. We believe that. It was a separate independent abuse of discretion, but this court need not reach that. But if we find that he was in error in that respect, do you think that we still could affirm? Absolutely. The district court in this case had two independent bases for finding that the board abused its discretion. One was adopting an unreasonable, strained interpretation of the effect of a Social Security award, a Social Security finding of disability. And second, completely independently, the district court found that the plan abused its discretion by reaching a decision for which there was no substantial basis and for no substantial evidence and against which there was, as the district court put it, overwhelming evidence to the contrary. And just to make this clear, it's not only the neurologist and the psychiatrist's evaluation and the fact that they explained that this had been a degenerative disease for five to ten years, but they each tied it back to the fact that Mr. Solomon had been unable to work. He lost his job. He was forced to resign in November 2007. It is undisputed that that is when he lost his job and that the reasons for his losing the job were behavioral issues, cognitive disinhibition, headaches, numbness, precisely the symptoms that he suffered with throughout that period of time and that then Dr. Fernandez... You think you have to convince us of all that. I don't. I don't. That is clear from the record. But you said it's clear from our questions. Yeah, I think it is clear from all of the above, Your Honors. So I'm happy to address the evidence further or the Social Security provision if you'd like, but if not... I think we're in good shape. Thank you. Thank you. Judge, do you have any rebuttal? I would just like for a moment to address the plan interpretation point, and I do think it was erroneous for the district court to apply the doctrine of contra-propertum in this case to construe the plan provision. I think you have to reach that question first because if the board was, I think, barred by the terms of the plan to accept the October 29, 2008, Social Security onset date, that's the way it had always been interpreted. The board has discretion. Classification decisions were reserved for the board. It wasn't to unilaterally accept that date. Although they changed... I may be wrong about this. Correct me if I'm wrong. Didn't the plan address that point going forward a little more carefully in its regulations? Am I remembering that incorrectly? Yes. No. The plan was amended following this to adopt essentially the board's... Yes, I understand. To adopt the board's interpretation. The district court judge used that prior... And that's what you're referring to as the contra-preferendum, are you? Right. I think that was clear error, and I think that was the majority of the decision for the district court. Why do we have to reach that if we don't reach the Social Security onset date issue, in your view? Because I think it's setting up a question here of the conflict between the Social Security onset date and his prior application history. We don't reach the Social Security argument. Ducky. Oh, ducky. And I think that was just the final point that I intended to make. Thank you very much. We will ask our clerk to adjourn the court, and then we'll come down and greet the lawyers. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Diana Gribbon Motz, Dennis W. Shedd, Allyson K. Duncan